# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| JIM CURRY; STUART ROGOFF; MONIQUE BROOKINS; VALERIE GRUENKE; EMMA MENDOZA; ALEXIS BELL; DAWN WILKINS; CARLOS ROMERO; KATHI CASSI; TAMARA JOHNSON; VERONICA CALLAHAN; AMANDA PARKS; MARSHONNTRI AUSTIN; LINDA MICHAUD; and LOIS COLEMAN, individually and on behalf of all others similarly situated, | Case No. 2:22-cv-00651-JNP-DBP |
| | Honorable Jill N. Parrish |
| Plaintiffs, | |
| v. | |
| MRS. FIELDS GIFTS, INC., | |
| Defendant. | |

**PLAINTIFFS' [CORRECTED] RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND TO STRIKE THE FIRST AMENDED COMPLAINT**[1]

---

[1] The undersigned regrettably experienced a technical issue with the track changes feature of Microsoft Word while finalizing Plaintiff's response brief (ECF No. 53) that inadvertently resulted in the filing of a version of the brief that contains numerous formatting issues as well as the inadvertent inclusion and omission of certain content. This version corrects those issues but remains substantively the same as the originally filed brief.

Plaintiffs, Jim Curry, Stuart Rogoff, Monique Brookins, Valerie Gruenke, Emma Mendoza, Alexis Bell, Dawn Wilkins, Carlos Romero, Kathi Cassi, Tamara Johnson, Veronica Callahan, Amanda Parks, Marshonntri Austin, Linda Michaud, and Lois Coleman, submit this response in opposition to the Motion to Dismiss and Strike (ECF No. 49 (the "Motion" or "Mot.")) the First Amended Complaint (ECF No. 45 (the "FAC")) filed by Defendant Mrs. Fields Gifts, Inc. ("Mrs. Fields").

## INTRODUCTION

In this putative class action, Plaintiffs allege in the operative First Amended Complaint ("FAC") that Defendant rented and sold (for money), exchanged (for other valuable consumer data), and otherwise disclosed for compensation Plaintiffs' (and all of its other customers') nonpublic personal information – including information Defendant gathered in connection with Plaintiffs' purchases of its products – to any third party interested in acquiring it, including data aggregators, data appenders, data cooperatives, aggressive advertisers, and other third parties. The nonpublic personal information Defendant disclosed included Plaintiffs' full names, home addresses, the fact that these individuals are customers of Mrs. Fields, and details concerning the orders they placed with Mrs. Fields, as well as myriad other categories of individualized data and demographic information, including their purchasing habits and personal preferences. And egregiously, Defendant made these disclosures without providing Plaintiffs or any of its other customers prior notice that it would do so. By disclosing Plaintiffs' nonpublic personal information to third parties for compensation, without providing Plaintiffs clear and conspicuous notice of these practices (and thus an opportunity not to be subjected to them before they made their purchases), Defendant violated Utah's Notice of Intent to Sell Nonpublic Personal Information Act, Utah Code Ann. § 13-37-101, *et. seq*. (the "NISNPIA") – and, in the process, infringed Plaintiffs' concrete interests in keeping their nonpublic personal information private and preventing intrusions upon their personal affairs and concerns (such as their personal preferences and purchasing habits).

The Motion is the second attempt by Defendant to dismiss this case at the pleadings stage.

The Court denied Defendant's first motion to dismiss (for lack of subject-matter jurisdiction, based on a procedural provision of the statute that bars class actions but which, as the Court explained, does not apply in a federal proceeding).  Defendant now moves to dismiss the FAC on two other grounds.  First, Defendant argues that Plaintiffs fail to demonstrate that the alleged violations of NISNPIA caused them any "concrete" harm, as required to satisfy the injury-in-fact prong of Article III's standing requirement, and that the case should therefore be dismissed for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).  Second, Defendant argues that Plaintiffs' allegations fail to demonstrate that their purchases of Mrs. Fields's goods were "initiated or completed in" Utah and thus fail to state a claim for relief under the statute, warranting dismissal pursuant to Rule 12(b)(6).  And finally, as a back-up to its arguments for dismissal, Defendant moves to strike two aspects of the FAC's proposed class definition, pertaining to the geographic and temporal scope of certain criteria for class membership, pursuant to Rule 12(f).

All of Defendant's arguments, in support of both dismissal and the request to strike portions of the class definition, are completely without merit.  With respect to Article III standing, Defendant's disclosures of Plaintiffs' nonpublic personal information concretely harmed the very privacy interests conferred by the statute – namely, in preventing unauthorized disclosures of nonpublic personal information to third parties for compensation and being free from intrusions into private affairs and concerns.  The privacy interests that Defendant's disclosures harmed are well rooted in common law, and NISNPIA's passage reflects the determination of the Utah legislature to protect those interests from infringement.  Defendant's infringement of Plaintiffs' concrete privacy interests afforded by NISNPIA manifested intangible harm sufficient to satisfy Article III.  Defendant's fallback argument for dismissal – that Plaintiffs fail to state a claim for violation of the statute because they are not Utah residents, and their purchases of Defendant's goods were not "initiated or completed in Utah" – fails for several reasons. For one thing, the plain statutory language (as well as legislative history) confirms that NISNPIA protects any person, regardless of state of residence, from nonconsensual disclosures of their nonpublic personal information by Utah-based companies.  Additionally, Defendant's sales of goods to Plaintiffs were

all "completed in [Utah]," where Defendant maintains its headquarters, because Defendant shipped the purchased goods from within Utah.  Nor is there any basis to strike the proposed class definition's nationwide scope or the criterion for membership based upon the timing of Defendant's collection of a person's nonpublic personal information.  The plain language of the statute makes clear that a claim accrues upon a disclosure following a failure to have provided the specified notice, and persons located anywhere in the United States who purchased Defendant's goods for shipment by Defendant, from its headquarters in Utah, are entitled to obtain redress from such disclosures.

Plaintiffs have Article III standing, and the FAC states a claim and properly defines the proposed class.  The Motion should be denied in its entirety.

### THE PERTINENT STATUTORY SCHEME

Pursuant to the NISNPIA, "[a] commercial entity[2] may not disclose nonpublic personal information[3] that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction[4] if the commercial entity fails to comply with Section 13-37-201." Utah Code Ann. § 13-37-202.

Section 13-37-201, in turn, requires a commercial entity to provide the consumer with notice if "the commercial entity enters into a consumer transaction with that person[,]" "as a result of the consumer transaction . . .  the commercial entity obtains nonpublic personal information

---

[2]     A "commercial entity" is a person that "has an office or other place of business located in [Utah]" and "in the ordinary course of business transacts a consumer transaction in [Utah]." *Id.* § 13-37-102(2)(a).

[3]     "Nonpublic personal information" means "information that . . . is not public information" and, "either alone or in conjunction with public information, identifies a person in distinction from other persons." *Id.* § 13-37-102(5)(a).  "Nonpublic personal information" expressly includes, *inter alia*, "the purchasing patterns of a person" or "the personal preferences of a person." *Id.* § 13-37-102(5)(b)(iii)-(iv) (emphasis added).

[4]     "Consumer transaction" means, *inter alia*, "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition . . . of[] goods[,] services[,] or other tangible or intangible property, . . . that is initiated or completed in [Utah]." *Id.* § 13-37-102(4)(a)(i) (emphasis added).

concerning that person[,] and "the commercial entity intends to or wants the ability to disclose the nonpublic personal information . . . to a third party . . . for compensation," where such compensation "is the primary consideration for the commercial entity disclosing the nonpublic personal information," is "directly related to the commercial entity disclosing the nonpublic personal information," and "is not compensation received by the commercial entity in consideration of a transaction [wherein a third party provides the commercial entity with: "(i) services, including business outsource services; (ii) personal or real property; or (iii) other thing of value"]." *Id.* § 13-37-201(1)(a); § 13-37-201(5). The notice "shall be given before the earlier of . . . the point at which the person is requested to provide the nonpublic personal information[,] or . . . the commercial entity otherwise obtains the nonpublic personal information as a result of the consumer transaction[.]" *Id.* § 13-37-201(2).[5]

By way of the foregoing provisions, which make up the substantive framework of the NISNPIA, the statute protects persons' concrete interests in maintaining the privacy of their nonpublic personal information and in preventing intrusions into their private affairs and concerns caused by disclosures of such information (including information that divulges their purchasing habits and personal preferences).[6]

---

[5]     The notice required by section 13-37-201 "shall read substantially as follows: 'We may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." *Id.* § 13-37-201(3)(a). The notice may be provided either "orally, if the consumer transaction itself is entirely conducted orally[,] or . . . in writing, if the notice is written in dark bold." *Id.* § 13-37-201(3)(b). In either case, the notice "shall be <u>sufficiently conspicuous</u> so that a reasonable person would perceive the notice before providing the nonpublic personal information." *Id.* § 13-37-201(3)(c) (emphasis added).

[6]     Indeed, in the Court's order denying Defendant's motion to dismiss the original complaint, the Court explained that section § 203(1) [of the NISNPIA], together with §§ 201 and 202, including by reference to definitions provided under § 102, provide the *cause of action*—that is, the claim or right." *Curry v. Mrs. Fields Gifts, Inc.*, No. 222CV00651JNPDBP, 2023 WL 6318108, at *6 (D. Utah Sept. 28, 2023). Specifically, Section 203(1)(a)-(c) – entitling a "person [to] bring an action against a commercial entity . . . if . . . the commercial entity enters into a consumer transaction with that person[,] the commercial entity obtains nonpublic personal information concerning that person" as a result of such consumer transaction, and "the commercial entity violates this chapter" – "thereby outlines the 'operative group of facts' that must be pleaded in order to give rise to a basis for suing, and thus 'defines the dimensions of [the] state-created

## ARGUMENT

### I.    Plaintiffs Have Article III Standing, and the Court has Subject-Matter Jurisdiction

First, Defendant argues that Plaintiffs lack Article III standing to seek redress in federal court.  The argument is without merit.

To establish Article III standing, a plaintiff must allege an "irreducible constitutional minimum" of an "injury-in-fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "Injury in fact is a low threshold." *See Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008). It "is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.).  With respect to the concreteness prong of the injury-in-fact requirement, the focus in Defendant's Motion, the Supreme Court in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) acknowledged the obvious point that "concrete" injuries need not be tangible. *Spokeo*, 136 S. Ct. at 1549.

To test whether a statutory right and remedy pass the threshold "constitutional minima" for standing, *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979), "history and the judgment of Congress play important roles," *Spokeo*, 136 S. Ct. at 1549.  An intangible injury is likely concrete if it historically "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," *id*., but an "exact

---

claim.'" *Id.* (quoting *Cause of Action*, Black's Law Dictionary (11th ed. 2019) & *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (Stevens, J., concurring). The statute, therefore, confers substantive rights on persons who enter into "consumer transactions" with "commercial entities" not to have those commercial entities turn around and sell the nonpublic personal information they gathered as a result of those transactions (including information that intrudes upon their personal affairs and concerns such as their "purchasing habits" and "personal preferences") to third parties for compensation, unless the person was clearly and conspicuously provided, before entering into the consumer transaction, the notice specified in section 201 (such that the consumer, by proceeding with the transaction after receiving the specified notice, is expressing consent to such disclosures on an informed basis). *See* NISNPIA § 202(1) ("A commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with Section 13-37-201."). As this Court recognized in its order, these are the provisions that confer the "substantive rights" created by the statute. *Curry*, 2023 WL 6318108, at *7 (referring to these provisions as "Utah's substantive rights under NISNPIA" and as the "framework of substantive rights. . . provided under [NISNPIA]") (citation omitted).

duplicate in American history and tradition" is not required. *TransUnion LLC v. Ramirez*, ⸺ U.S.

⸺, 141 S. Ct. 2190, 2204 (2021). And such an injury is likely concrete if a legislature has

created a substantive right and provided a statutory remedy. *See Spokeo*, 136 S. Ct. at 1549 (noting

that "Congress is well positioned to identify intangible harms that meet minimum Article III

requirements," and has the power to "'elevat[e] to the status of legally cognizable injuries concrete,

de facto injuries that were previously inadequate in law'") (quoting *Lujan*, 504 U.S. at 578).

However, legislatively created rights and remedies, like judicially created common law, must

involve concrete injury to be justiciable. *Id*. A "bare procedural violation, divorced from any

concrete harm," *id* at 1550, is not enough.[7] "This does not mean, however, that the risk of real

harm cannot satisfy the requirement of concreteness." *Id*. (emphasis added).

History and congressional judgment each demonstrate that violations of NISNPIA's

disclosure prohibition easily satisfy the "constitutional minima" for standing. *Gladstone*, 441 U.S.

at 100. First, the right to privacy has been recognized as a basis for a lawsuit in American courts

for over a century. Samuel D. Warren & Louis D. Brandeis, *The Right of Privacy*, 4 Harv. L. Rev.

193, 198 (1890) (recognizing a "general right to privacy" at common law). In their seminal work,

Samuel Warren and Louis Brandeis observed that "modern enterprise and invention have, through

invasions upon his privacy, subjected [the individual] to mental pain and distress, far greater than

could be inflicted by mere bodily injury." *Id.* at 196. By a half-century ago, a right of privacy had

already been "recognized at common law in 30 States plus the District of Columbia." *Time, Inc. v.

Hill*, 385 U.S. 374, 383 n.7 (1967); *see also U.S. Dep't of Justice v. Reporters Committee for

Freedom of Press*, 489 U.S. 749, 762-63 (1989) (explaining the kinds of privacy rights at common

law). Notably, the Supreme Court recently identified "disclosure of private information" and

"intrusion upon seclusion" as examples of "concrete, intangible harms" that American courts have

long recognized at common law and continue to manifest Article III standing today. *Seale v.*

---

[7] "For example, a small typographical error in the name of a creditor" – technically a violation of the Fair Debt Collection Practices Act – "is unlikely to work any concrete harm." *Rodriguez v. Cascade Collections LLC*, 532 F. Supp. 3d 1099, 1111 (D. Utah 2021) (Parrish, J.) (citations omitted).

*Peacock*, 32 F.4th 1011, 1020 (10th Cir. 2022) (quoting *TransUnion*, 141 S. Ct. at 2204).

Second, in enacting NISNPIA, the Utah legislature exercised its judgment to further define the right to encompass consumers' interests in keeping nonpublic personal information private. In strictly regulating compensation-driven disclosures of nonpublic personal information gathered as a result of consumer transactions, NISNPIA created concrete privacy interests in preventing unauthorized disclosures of a person's nonpublic personal information, as well as protecting against intrusions into the person's private affairs and concerns (including his or her personal preferences and purchasing habits, both of which are matters that the "nonpublic personal information" covered by the statute touches upon). *See* Utah Code Ann. § 13-37-201 & § 13-37-102 (prohibiting Utah-based companies from disclosing any person's "nonpublic personal information," such as "the purchasing patterns of [the] person" or "the personal preferences of [the] person," obtained as a result of the person's purchase of consumer goods from the company, unless the person was provided the notice specified in section 13-37-201 before transacting with the company); *See* Transcript of Proceedings, *In Re: HB 40*, Utah House of Representatives, 2003 General Session, Feb. 6, 2003, a true and correct copy of which is attached hereto as Exhibit A[8], at 9:14-16 (Rep. Douglas C. Aagard, NISNPIA's sponsor, explaining that the statute's intent is to confer "a right to privacy that an individual deserves" with respect to their nonpublic personal information collected by companies as a result of consumer transactions); *id.* at 14:22-25, 15:1-16 (Rep. Judy Ann Buffmire expressing concern over the exploitation of nonpublic personal information by companies). NISNPIA is thus a distinctly modern privacy right, but as such has deep roots in common law. Warren and Brandeis, with their appreciation for the threats posed by modernity to individual security, would immediately appreciate NISNPIA as a digital-era statutory outgrowth of common-law privacy rights.

By establishing a concrete privacy interest in nonpublic personal information, with a

---

[8]    The full audio of the General Session is available at https://le.utah.gov/av/videoClip.jsp?meetingType=floor&stream=https://stream1.utleg.gov/vodhouse/mp4:9893.mp4/playlist.m3u8 (last accessed March 20, 2024). The transcript attached hereto as Exhibit A was prepared by a certified court reporter at counsel for Plaintiffs' request.

private right to statutory damages, the legislature conferred upon the consumer a new substantive right to privacy and the means to enforce it.  The judiciary is in no position to second-guess the importance of the right or the remedy.  *Cf. Spokeo*, 136 S. Ct. at 1549 ("[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important."); *TransUnion*, 141 S. Ct. at 2204 ("Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation") (citation omitted).

Decisions addressing plaintiffs' Article III standing to redress unauthorized disclosures of personal information in violation of the federal Video Privacy Protection Act ("VPPA") and the Michigan Preservation of Personal Privacy Act ("PPPA") confirm the concreteness of the injuries suffered by Plaintiffs here.  Like the NISNPIA, both the VPPA and PPPA prohibit sellers of certain goods (written or audio-visual materials) from disclosing records concerning their customers' purchases of those materials to third parties, unless customers are provided prior notice of the disclosures.  *See* 18 U.S.C. § 2710 (VPPA); M.C.L. § 445.1712 (PPPA).  Courts across the country unanimously agree that disclosures of personal information in violation of the VPPA[9] and the

---

[9]     *See Perry v. Cable News Network, Inc.*, 854 F.3d 1336 (11th Cir. 2017) (holding that plaintiff "has satisfied the concreteness requirement of Article III standing where the plaintiff alleges a violation of the VPPA for a wrongful disclosure," because "Supreme Court precedent has recognized in the privacy context that an individual has an interest in preventing disclosure of personal information") (citing *Reporters Comm. for Freedom of the Press*, 489 U.S. at 762); *see also, e.g., Martin v. Meredith Corp.,* 2023 U.S. Dist. LEXIS 27539 (S.D.N.Y. Feb. 17, 2023) (unpublished) (holding that any disclosure of private, VPPA-protected information to a third party without consent is "sufficient to confer standing")*; In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 274 (3d Cir. 2016) (holding that a violation of the VPPA confers Article III standing, because "the harm is … concrete in the sense that it involves a clear de facto injury, i.e., the unlawful disclosure of legally protected information"); *Yershov v. Gannet Satellite Info. Network, Inc.*, 240 F. Supp. 3d 353, 361 (D. Mass. 2016) (holding that consumers alleging a defendant violated the VPPA by "knowingly disclos[ing] their [personally identifiable information] to a third party without their consent have satisfied the concreteness requirement for Article III standing"); *Austin-Spearman v. AMC Network Entm't LLC*, 98 F. Supp. 3d 662, 666 (S.D.N.Y. 2015) ("Notably, every court to have addressed this question has reached the same conclusion, affirming that the VPPA establishes a privacy right sufficient to confer standing through its deprivation").

PPPA[10] manifest concrete harm sufficient to satisfy Article III.  Just like the plaintiffs in these analogous VPPA and PPPA cases, Plaintiffs here were deprived of their right not to have their nonpublic personal information disclosed to third parties for compensation absent their informed consent (i.e., without having first received the notice required by the statute and thus the ability not to proceed with the transaction), which is enough to satisfy Article III.[11]

The Supreme Court's recent decision in *TransUnion LLC v. Ramirez* only further bolsters

---

[10]      *See also Coulter-Owens v. Time, Inc.*, 695 F. App'x 117, 121 (6th Cir. 2017) (unpublished) ("[T]he disclosure of that information is a cognizable injury in fact for purposes of Article III standing."); *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873 (E.D. Mich. 2017) ("[B]ecause the alleged violation of the Michigan [PPPA] here implicates plaintiffs' 'concrete interest' in the nondisclosure of their personal information without their permission, they have adequately pled a concrete injury-in-fact."); *Lin v. Crain Commc'ns Inc.*, 2020 WL 248445, at *6 (E.D. Mich. Jan. 16, 2020) (unpublished) ("The alleged violation of Michigan's PPPA implicates [plaintiff's] 'concrete interest' in the disclosure of his PRI without permission."); *Kinder v. Meredith Corp.*, 2014 WL 4209575, at *4 (E.D. Mich. Aug. 26, 2014) (unpublished) (finding Article III standing existed where plaintiff alleged bare statutory violation of the PPPA); *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 185 (S.D.N.Y. 2017) ("[E]very court to consider the issue of standing under the [PP]PA has concluded that such a violation constitutes a concrete injury in and of itself."); *Halaburda v. Bauer Pub. Co.*, 2013 WL 4012827, at *3-5 (E.D. Mich. Aug. 6, 2013) (unpublished) (disclosure of person's information in violation of the [PPPA] is a cognizable injury-in-fact and confers Article III standing); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 627-28 (E.D. Mich. 2017) (same). Notably, following the Supreme Court's decision in *TransUnion,* courts assessing Article III standing in the PPPA context have continued to consistently hold that a disclosure made in violation of the statute necessarily results in an invasion of privacy that manifests an injury-in-fact sufficient to satisfy Article III.  *See Pratt v. KSE Sportsman Media*, *Inc.* 586 F. Supp. 3d 666, 676-677 (E.D. Mich. 2022) (holding that "it is well established that a properly alleged PPPA claim confers Article III standing," and finding that *TransUnion* only "reinforces" that a PPPA plaintiff has Article III standing).

[11]      Defendant's violations of NISNPIA were far more invasive of privacy than violations of other consumer privacy statutes that district courts of the Tenth Circuit (and throughout the country) have routinely found sufficient to confer Article III standing.  For instance, if the receipt of an unsolicited phone call is invasive enough to constitute a concrete harm, then the disclosure of consumers' nonpublic personal information to data miners, data aggregators, aggressive marketers, and other third parties surely is as well. *See, e.g., Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021) (plaintiff who received unwanted phone call and voicemail message "suffered an injury bearing a 'close relationship' to the tort of intrusion upon seclusion," satisfying Article III's standing requirements); *Wesley v. Snap Fin. LLC*, 339 F.R.D. 277, 295 (D. Utah 2021) (receipt of unwanted telephone calls "sufficiently allege[s] an injury-in-fact for Article III standing); *LaVigne v. First Cmty. Bancshares, Inc.*, 215 F. Supp. 3d 1138, 1147 (D.N.M. 2016) (same).

this conclusion.  In *TransUnion*, the Supreme Court considered whether two groups of class members asserting claims under the Fair Credit Reporting Act suffered a concrete injury in fact under Article III. *TransUnion*, 594 U.S. at 2208-13. The first group of class members had a misleading credit report disseminated to a third party. *Id.* at 2208-09.  The second group merely had a misleading remark on their credit files, but those files were not disseminated to a third party. *Id.* at 2209.  The Supreme Court held that the first group – those who had a misleading credit report disseminated to a third party – had suffered a concrete injury in fact under Article III. *Id.* ("In short, the 1,853 class members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III.").  Here, likewise, Plaintiffs allege that their private, nonpublic personal information, pertaining to their purchases of consumers goods from Defendant, was sold by Defendant for profit to numerous third parties (in fact, to anyone who had an interest in purchasing it), without prior notice let alone consent.  *See, e.g.,* FAC ¶¶ 11-82.  Disclosures of private information like those made by Defendant here were specifically identified by the Supreme Court in *TransUnion* as examples of intangible harms that have been "traditionally recognized as providing a basis for [a] lawsuit[] in American courts."  *See TransUnion*, 594 U.S. at 425 (2021) (citing "disclosure of private information" as a "chief" example of the sort of harm "traditionally recognized as providing a basis for [a] lawsuit[] in American courts").

Nevertheless, Defendant argues that "mere disclosure of personal information does not confer Article III standing," and in support cites to several readily distinguishable decisions finding that plaintiffs lacked Article III standing to bring data-breach cases in federal court. (Mot. at 6.) Each of the cited decisions, however, addressed data that was allegedly breached but not "misused" in any way, or involved a claimed misuse that could not be traced to the breach. *See e.g., Ruskiewicz v. Oklahoma City Univ.*, No. CIV-23-303-D, 2023 WL 6471716 at * 3 (W.D. Okla. Oct. 4, 2023) (plaintiff lacked Article III standing where she failed to allege "that her personal information has been posted or sold on the dark web as a result of the data breach").  In this case, by contrast, Plaintiffs allege that their nonpublic personal information was misused by Defendant in precisely the way that the Utah legislature enacted NISNPIA to prevent against (namely, sold

to data brokers, data aggregators, aggressive marketers, other consumer-facing companies, and anyone else willing to pay for it), which infringed upon the substantive privacy interest that the statute conferred.  (*See, e.g.,* FAC ¶¶ 1, 5, 107-108, 127, 146.).  The cases on which Defendant relies involve circumstances that simply do not compare to the Defendant's flagrant misuse of Plaintiffs' nonpublic personal information in this case (specifically, selling it on the open market to any third party interested in acquiring it), without prior notice to Plaintiffs much less their permission.  *See C.C. v. Med-Data Inc.*, No. 21-2301-DDC-GEB, 2022 WL 970862, at *4 (D. Kan. Mar. 31, 2022) ("predict[ing] that the Tenth Circuit" would find a concrete injury sufficient to satisfy Article III based on allegations of a "misuse of [a plaintiff's] data"); *c.f., e.g., In re 21st Century Oncology Customer Data Sec. Breach Litig.*, 380 F. Supp. 3d 1243, 1255 (M.D. Fla. 2019) (finding Article III standing in data breach case where the plaintiffs alleged that breached data was advertised for sale and sold to third party on at least one occasion).

Defendant also cites to the Tenth Circuit's decision in *Shields v. Pro. Bureau of Collections of Md.*, 55 F.4th 823 (10th Cir. 2022) as purportedly supporting the ill-founded idea that unauthorized disclosures of personal information cannot confer Article III standing unless the disclosures were made to the public at large.  *Shields* is both factually and legally inapposite.  There, a lender used a mailing service vendor to communicate with the plaintiff about a debt.  *Shields,* 55 F.4th at 827.  The plaintiff sued the lender for violation of the Fair Debt Collection Practices Act's prohibition on debt collectors "communicating, 'in connection with the collection of any debt, with any person' without the consumer's consent or court permission."  *Id.* at 828 (citation omitted).  Applying *TransUnion*, the Tenth Circuit concluded that the plaintiff had failed to show a close relationship between the harm she experienced and the common law tort of "disclosure of private facts" (because the lender only disclosed facts about the debtor's debt to a single third-party, its mailing vendor, as opposed to disclosing those facts "publicly"), and accordingly affirmed the district court's dismissal of plaintiff's case for lack of Article III standing.  *Id.*  Here, by contrast, Plaintiffs allege that Defendant offered to sell Plaintiffs' nonpublic personal information on the open market, and that Defendant in fact sold such information to numerous

11

third parties. Defendant's widespread disclosures of Plaintiffs' nonpublic personal information in this case, to any member of the public interested in purchasing it – a far cry from the disclosure to a single vendor in *Shields* – are plainly analogous to the tort of disclosure of private facts recognized at common law and thus readily satisfy Article III's concreteness test.[12]   *See, e.g., Bohnak v. Marsh & McLennan Co.*, 79 F.4th 276, 285-86 (2d Cir. 2023) (concluding that the disclosure of personal information "to unauthorized third parties," rather than to the public at large, has the requisite "close relationship" to the tort of public disclosure of private facts, with the court noting that it did not "stretch to reach this conclusion," because "the intangible harm arising from disclosure of one's [personal information] bears a relationship to an injury with a close historical or common-law analogue," even if it is not "an exact duplicate"); *Masterson v. IMA Fin. Grp., Inc.*, No. 223CV02223HLTADM, 2023 WL 8647157, at *7 (D. Kan. Dec. 14, 2023) (unpublished) (public disclosure of private facts occurs where personal information is "exposed in a way that would facilitate easy, imminent access" to it).

Notably, while the plaintiff in *Shields* attempted to analogize her harm to the common law tort of "disclosure of private facts," she made no attempt to analogize it to the common law tort of "intrusion upon seclusion" – another "chief" example of an intangible concrete harm "traditionally recognized as providing a basis for [a] lawsuit[ ] in American courts." *TransUnion*, 594 U.S. at 425; *see also Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021) ("At common law, courts readily recognized a concrete injury arising from the tort of intrusion upon seclusion—a tort

---

[12]        Notably, in enacting NISNPIA, the Utah legislature specifically distinguished between disclosures of customers' personal information to disclosing parties' agents and disclosures to unrelated third parties.  *See* Utah Code Ann. § 13-37-203 (imposing liability on "commercial entities" who make disclosures in violation of the statute); Utah Code Ann. § 13-37-102(7)(b) (exempting from liability disclosures made to "an affiliate or agent of the commercial entity that obtains nonpublic personal information"). The legislature judged that a disclosure of nonpublic personal information to an agent performing work for the disclosing party, without any compensation paid by the agent in exchange for the information – like the disclosure at issue in *Shields* – works no harm to the consumers' privacy and therefore need not be prohibited by the statute, whereas the sale of information to a third party unrelated to the disclosing party – like all of Defendant's disclosures of Plaintiffs' nonpublic personal information at issue in this case – harms consumers' privacy interests and thus deserved to be prohibited by the statute.

protecting against defendants who intrude into the private solitude of another.") (citing Restatement (Second) of Torts § 652A(2)(a) (1977)).[13]  So while the Tenth Circuit in *Shields* "rejected a link to the tort of intrusion upon seclusion in a single sentence (without analysis) because the plaintiff never alleged any intrusion in her 'private solitude'," *Salazar v. Nat'l Basketball Ass'n*, No. 1:22-CV-07935 (JLR), 2023 WL 5016968, at *6 (S.D.N.Y. Aug. 7, 2023) (unpublished), in this case Plaintiffs' allegations adequately demonstrate that Defendant's disclosures intruded upon their seclusion.

Indeed, the factual allegations of the FAC adequately show (or at the very least plausibly suggest) that Defendant, in addition to disclosing Plaintiffs' private facts (discussed above), intruded upon their private affairs and concerns by selling, to third parties on the open market, their nonpublic personal information that revealed their personal preferences and purchasing habits (information that Defendant gathered as a result of Plaintiffs' purchases of its goods), all without providing prior notice to Plaintiffs let alone obtaining their consent – practices that a reasonable person would find highly offensive.  *See, e.g.,* FAC ¶¶ 1, 5, 107-108, 96-123, 127, 134-135 146.[14]

---

[13]     "Intrusion upon seclusion occurs when an individual 'intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns ... if the intrusion would be highly offensive to a reasonable person.'" *Salazar*, 2023 WL 5016968, at *5–6 (S.D.N.Y. Aug. 7, 2023) (quoting Restatement (Second) of Torts § 652B (1977)). Notably, an intrusion upon seclusion "does not depend upon any publicity given to the person whose interest is invaded or to his affairs." *Scott v. Hern*, 216 F.3d 897, 917 (10th Cir. 2000). As an example of the injury, the Restatement (Second) highlights an intrusion into someone's privacy "by opening [a plaintiff's] private and personal mail." *Id.* cmt. b. "The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the ... information outlined." *Id.*

[14]     While Plaintiffs' allegations do not parrot the legal elements for the tort of intrusion upon seclusion – i.e., that "Defendant intruded upon their private affairs in a way that would be highly offensive to a reasonable person" – the FAC contains many factual allegations concerning Defendant's disclosure practices from which it may be reasonably inferred that Defendant's disclosures of Plaintiffs' nonpublic personal information to third parties for compensation were intrusive of Plaintiffs' private affairs or concerns (specifically, their private "purchasing habits" and "personal preferences," both of which are specifically identified in the statute as the sort of nonpublic personal information that deserves protection from disclosure), and that those disclosures would be highly offensive to a reasonable person (*see, e.g.,* FAC ¶¶ 1 & 114 (alleging that, "as a result of" Defendant's disclosures of such information, "Plaintiffs have received a

Following *TransUnion*, courts have had little difficulty finding common law analogues to the tort of intrusion upon seclusion for purposes of satisfying Article III.  *See, e.g., Salazar*, 2023 WL 5016968, at * 6 (S.D.N.Y. Aug. 7, 2023)  ("Plaintiff's claim that Defendant purposefully shared his private viewing information with a third party without Plaintiff's knowledge or consent is akin to" an "intrusion . . . upon [her] private affairs or concerns" that "would be highly offensive to a reasonable person"); *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1056 (D. Minn. 2023) (defendant website operator's disclosures of plaintiff's private video viewing history with Facebook found analogous to the tort of intrusion upon seclusion).[15]  Thus, regardless whether Defendants' sales of Plaintiffs' nonpublic personal information to the innumerable third parties described in the FAC can be said to constitute "public" disclosures of that information or not, those disclosures nonetheless revealed Plaintiffs' "purchasing habits" and "personal preferences," among other things, thereby intruding upon Plaintiffs' private affairs in a way that would be highly offensive to a reasonable person (and certainly to the Utah legislature).

According to Defendant, its nonconsensual sales of Plaintiffs' nonpublic purchase information caused only "informational injury," which it says "is insufficient to confer Article III standing" absent any "downstream consequences' from failing to receive the required

---

barrage of unwanted junk mail," causing "waste and inconvenience" and increasing their exposure to "fraudulent sweepstakes, charities, and buying clubs.") & ¶ 119, 135.  *See, e.g., Salazar*, 2023 WL 5016968, at *6 (rejecting argument from the defendant "that a comparison to the tort of intrusion upon seclusion is inappropriate because Plaintiff failed to plead that the conduct in question would be 'highly offensive to a reasonable person,' explaining that, at the pleading stage, Plaintiff has set forth enough to allege that was offensive to a reasonable person" based upon factual allegations similar to those found in the FAC here) (citing *Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" (quotation omitted)).

[15]     Notably, the defendant in *Feldman* cited to *Shields* in support of its argument that any disclosures it made were not "public" and were thus incapable of manifesting a concrete injury for purposes of Article III. The argument was rejected. *Feldman v. Star Tribune Media Co. LLC,* Dkt. 19 at 16-17 (making the argument); *Feldman,* 659 F. Supp. 3d at 1056 (finding standing under the VPPA).

information."  (Mot. at 5-6 (quoting *Laufer v. Looper*, 22 F.4th 871, 881 (10th Cir. 2022) & *TransUnion*, 141 S. Ct at 2214)).  This too misses the mark.  The proper focus of the Article III standing inquiry is the harm caused by Defendant's nonconsensual disclosures of Plaintiffs' nonpublic personal information to third parties for compensation – the conduct giving rise to liability under the statute and which, as discussed above, in and of itself infringed upon Plaintiffs' concrete, NISNPIA-conferred interest in keeping such information private.  No additional "downstream" harm is necessary to satisfy Article III.  *See Eichenberger v. ESPN, Inc.,* 876. F.3d 979, 983084 (9th Cir. 2017) (holding that the privacy right the VPPA protects is infringed upon "any time a video service provider discloses otherwise private information," such that any further "showing [of] consequential harm" is unnecessary to establish Article III standing, and noting that "privacy torts do not always require additional consequences to be actionable").[16]

   To be sure, Defendant's failure to provide Plaintiffs with the notice specified in section 13-37-201 before they made their purchases, which Defendant fixates on in the Motion, is what rendered Defendant's subsequent disclosures of Plaintiffs' nonpublic personal information nonconsensual, because the failure to provide the notice deprived Plaintiffs of the option to forgo purchasing Defendant's goods (and thus avoid providing nonpublic personal information to Defendant for it to disclose).  *See* Ex. A at 9:20-21 (Rep. Aagard, NISNPIA's sponsor, explaining that the statute ensures that "the consumer will be informed" about a company's nonpublic personal information-disclosure practices before transacting with it, and "the consumer will have a choice" not to transact with the company if he or she wants to avoid having such information

---

[16]   Although Plaintiffs need not allege any additional "downstream" or "consequential" harms they suffered as a result of Defendant's disclosures (above and beyond the harms to their concrete privacy interests conferred by the statute, discussed above), they have nonetheless alleged that, "as a result" of Defendant's disclosures of their nonpublic personal information, they have each "received a barrage of unwanted junk mail" (FAC ¶ 1), which causes "waste and inconvenience" and increases their exposure to "fraudulent sweepstakes, charities, and buying clubs" (*see id.* ¶ 104).   Against this backdrop, there is nothing speculative or conclusory about Plaintiffs' allegations that Defendant's disclosures of their nonpublic personal information, made to a laundry list of data traffickers and advertisers, resulted in a "barrage of unwanted junk mail" at their homes. These allegations, although unnecessary to establish Plaintiffs' Article III standing, nonetheless establish an additional concrete harm caused by Defendant's NISNPIA-violative conduct.

disclosed for compensation); *id.* at 13:9-17 (Rep. Aagard explaining "my intent on this is, if I go into a store and I see that notice that they're going to sell my information, then I would need to make a choice as to whether I want to conduct a transaction with that business or go elsewhere. . . I want it to be the consumer choice."); *id.* at 13:20-23 (Rep. Wayne Harper stating that "[t]he notice is an essential part of what needs to be done to help the residents of the state of Utah and elsewhere to understand the choices they make, to have informed choices."). If an individual knowingly subjected himself or herself to Defendant's practices of selling customers' nonpublic personal information by purchasing Defendant's goods after having received the notice specified in section 13-37-201, it would be hard to deny that the individual had given consent to the subsequent disclosure of that information. *See, e.g., Santana v. Take–Two Interactive Software, Inc.*, 717 Fed. Appx. 12, No. 17-303, 2017 WL 5592589 (2d Cir. Nov. 21, 2017) (unpublished) (plaintiffs lacked Article III standing to complain about defendant's collection of their biometric data while playing a video game where they received notice before playing the game that defendant would collect their biometric data if they played the game). The greatest evil occurs when privacy-invading companies like Defendant obtain an individual's non-public personal information and then traffic that information to third parties on the open market, without having provided prior notice to (much less obtained informed consent from) the individual, as happened here. Thus, even when viewed in the "informational injury" context, Defendant's failure to provide Plaintiffs the notice specified in 13-37-201 worked concrete harm to their substantive, statutorily conferred interests in keeping their nonpublic personal information private and preventing intrusions into their personal affairs (including their personal preferences and purchasing habits). *See Robertson v. Allied Solutions*, 902 F.3d 690, 697 (7th Cir. 2018).

Instructive on this point is the Seventh Circuit's decision in *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617 (7th Cir. 2020), which addressed a plaintiff's Article III standing to bring a claim for violation of the Illinois Biometric Information Privacy Act ("BIPA") based upon the defendant's alleged unauthorized collection of the plaintiff's fingerprint when she made a purchase from one of defendant's vending machines. Section 15(b) of BIPA, the provision at issue in

*Bryant,* prohibits a company from, *inter alia,* collecting a person's biometric data unless it first provides certain disclosures to the person, including the purpose of collection and the length of retention. *See* 740 Ill. Comp. Stat. Ann. 14/15(b). Noting "the substantive and personal nature of the information [the defendant] was obligated under BIPA to disclose to consumers such as [the plaintiff]," the Seventh Circuit held that the plaintiff had suffered concrete harm from the defendant's violations of section 15(b)'s disclosure requirements, reasoning as follows:

> [T]he informed-consent regime laid out in section 15(b) is the heart of BIPA. The text of the statute demonstrates that its purpose is to ensure that consumers understand, before providing their biometric data, how that information will be used, who will have access to it, and for how long it will be retained. . . . Compass's failure to abide by the requirements of section 15(b) before it collected Smart Market users' fingerprints denied Bryant and others like her the opportunity to consider whether the terms of that collection and usage were acceptable given the attendant risks. This was not a failure to satisfy a purely procedural requirement. Rather, as in *Robertson,* Compass withheld substantive information to which Bryant was entitled and thereby deprived her of the ability to give the *informed* consent section 15(b) mandates. Equipped with the missing information, she may have chosen not to use the vending machines and instead brought her own lunch or snacks. Or she may have opted for the convenience of the machines. She did not realize that there was a choice to be made and what the costs and benefits were for each option. This deprivation is a concrete injury-in-fact that is particularized to Bryant. She thus meets the requirements for Article III standing on her section 15(b) claim.

*Bryant,* 958 F.3d at 626; *see also Patel v. Facebook Inc.*, 290 F. Supp. 3d 948, 953–54 (N.D. Cal. 2018). *Bryant*'s reasoning applies with equal force in this case. Defendant withheld substantive information to which Plaintiffs were entitled, depriving Plaintiffs of "the ability to give the *informed* consent section [13-37-201] mandates." *See id.* Accordingly, Defendant's disclosures of Plaintiffs' nonpublic personal information, made without the informed consent that compliance with section 13-37-201's notice requirement would have manifested, is "a concrete injury-in-fact that is particularized to [each of the Plaintiffs]." *Id.; see also Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1161 (7th Cir. 2021) ("Failure to comply with these requirements deprives a person of 'the opportunity to consider whether the terms of... collection and usage [are] acceptable given the attendant risks.' That deprivation ... is a concrete and particularized harm.") (quoting *Bryant,* 958 F.3d at 626).

It is thus irrelevant that Plaintiffs "have not alleged that there are any actions they would

have taken differently had they been provided notice—such as alleging that they would have opted out or that they would have decided not to purchase cookies or other products from Mrs. Fields in the first place." (Mot. at 6.) The salient point is that Defendant failed to provide Plaintiffs the notice specified in Section 13-37-201 before they made their purchases (and thus before Defendant obtained the nonpublic personal information at issue), and therefore lacked Plaintiffs' consent, implied or otherwise, to thereafter disclose their nonpublic personal information to third parties for compensation. And by doing so anyway, Defendant directly infringed Plaintiffs' concrete, NISNPIA-conferred right to keep that personal information private.

By Defendant's logic, nothing would stop it from amassing and then selling on the open market a tremendous, Orwellian electronic database of nonpublic personal information pertaining to all of its customers, with no permission whatsoever, so long as none of its customers could identify any "downstream" harms they suffered as a result of those disclosures. And indeed, that appears to be exactly what it is doing. The Utah legislature has it right. The practice is offensive to reasonable expectations of privacy. The statute should not be held unenforceable for lack of a concrete injury in the most compelling case for its application.

Plaintiffs have Article III standing, and the Court has subject-matter jurisdiction. The Motion should be denied.[17]

## II. The FAC Adequately Alleges that Defendant "Completed" its Sales of Consumer Goods to Plaintiffs in Utah, Even Though Plaintiffs Resided Outside of Utah

Next, Defendant argues that "Plaintiffs fail to plead that any of the named Plaintiffs 'initiated or completed' a consumer transaction 'in this state [i.e., Utah],' as the statute requires." (Mot. at 9 (quoting Utah Code Ann. §13-37-102(4).) This argument runs headlong into the Uniform Commercial Code.

---

[17]    In the unlikely event the Court finds that Plaintiffs have failed to adequately allege facts to plausibly establish a concrete injury sufficient to satisfy Article III, Plaintiffs respectfully request leave to amend their complaint to allege additional facts concerning their injuries.

NISNPIA affords protections to any person whose non-public personal information is gathered as a result of sale of consumer goods that is "initiated or completed in [Utah]." But the statute does not define what it means for a sale to be "initiated . . . in" or "completed in" Utah. However, the Utah Supreme Court has instructed courts to borrow the definition of "sale" from the Uniform Commercial Code, which Utah has adopted, in determining when (and thus where) a "sale" of goods is "completed" within the meaning of Utah's statutes. *See Utah Loc. Gov't Tr. v. Wheeler Mach. Co.*, 2008 UT 84, ¶¶ 34-36 (Parrish, J., concurring) ("Like the definition of product, the Utah Product Liability Act has spawned no judicial or legislative answer to the question of when a product is sold. Based on the above-discussed overlap between tort and contract, however, the UCC definition of sale can also be borrowed to provide a method to answer the timing question posed by Utah product liability law.").

Under the UCC, a "sale" occurs with "the passing of title from the seller to the buyer for a price." Utah Code Ann. § 70A–2–106(1). "Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods[.]" *Id.* § 70A–2–401(2). In other words, "under the UCC, a sale is complete when the seller completes the agreed-upon method of delivery of the goods." *Classic Concepts, Inc. v. Linen Source, Inc.*, No. CV 04-8088GPSMANX, 2006 WL 4756377, at *17 (C.D. Cal. Apr. 27, 2006) (unpublished). And where, as here, "the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer" – and the sale is "complete" – "at the time and place of shipment[.]". *See id*. § 70A-2-401(2)(a); *see also e.g., Butler v. Beer Across America,* 83 F. Supp. 2d 1261, 1264, 40 U.C.C. Rep. Serv. 2d 1008 (N.D. Ala. 2000); *Autrey v. Chemtrust Indus. Corp.*, 362 F. Supp. 1085, 1090 (D. Del. 1973)*; Lindgren v. GDT, LLC,* 312 F. Supp. 2d 1125, 1132 (S.D. Iowa 2004); *Erler*

*v. Hasbro, Inc.*, 506 F. Supp. 3d 1275, 1283–84 (N.D. Ga. 2020); *Classic Concepts, Inc. v. Linen Source, Inc.*, No. CV 04-8088GPSMANX, 2006 WL 4756377, at *17 (C.D. Cal. Apr. 27, 2006) (unpublished).[18]

In this case, the FAC adequately establishes that Defendant's sales of goods to Plaintiffs were "completed" in Utah.  The FAC alleges that Plaintiffs placed orders for Defendant's goods that called for Defendant to ship the purchased goods to addresses specified by the Plaintiffs, ***and that Defendant then did so from its headquarters in Salt Lake City, Utah***, *see* FAC ¶¶ 83-84, 134[19], which "complet[ed] [its] performance with reference to the physical delivery of the goods" and thus caused title to the goods to pass to Plaintiffs. *See* Utah Code Ann. § 70A–2–401(2).  Thus, Defendant "completed" its sales of goods to Plaintiffs "in [Utah]" within the meaning of the

---

[18]    "[B]ecause all fifty states have adopted the U.C.C., 'decisions from other jurisdictions interpreting the same uniform statute are instructive.'" *Erler*, 506 F. Supp. 3d at 1285 (quotation omitted).

[19]    Although the FAC does not describe the terms or mode of Plaintiffs' purchases, it may reasonably be inferred from the FAC's allegations, including those describing Defendant's sales channels and its shipping of goods purchased by Plaintiffs, that these were traditional business-to-consumer orders that Plaintiffs placed by selecting the advertised goods they wished to purchase and providing payment and the addresses to which Defendant should ship them.  These allegations adequately reflect that the parties agreed upon Defendant shipping the purchased goods to the addresses provided by Plaintiffs when they placed their orders (as opposed to delivering the goods at Plaintiffs' destinations).  And indeed, discovery will reveal that Plaintiffs' orders were placed on Defendant's website and that Defendant completed the sales by shipping the goods to the addresses specified by Plaintiffs. But to the extent the question of whether Defendant's sales were "completed in" Utah turns on issues of fact that cannot be resolved at this stage of the proceedings, the Court should nonetheless find that the FAC adequately alleges facts from which it may reasonably be inferred that the sales in question were "completed in" Utah when Defendant shipped the ordered goods to the Plaintiffs. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)) (factual allegations sufficient to state a claim if they "give the court reason to believe that [the] plaintiff has a reasonable likelihood of mustering factual support for [his or her] claims").  And in the unlikely event the Court finds that Plaintiffs have failed to adequately allege facts to plausibly demonstrate the sales were completed in Utah, Plaintiffs respectfully request leave to amend their complaint to allege additional facts concerning their orders of goods from Defendant.

NISNPIA when it shipped, from within Utah, the goods to the addresses specified by Plaintiffs. *See* Utah Code Ann. § 13-37-102(4)(a)(i)(A); Utah Code Ann. § 70A–2–106(1) (a "sale" occurs with "the passing of title from the seller to the buyer for a price"); *Utah Loc. Gov't Tr.*, 2008 UT 84, ¶¶ 34-36.

Without citing to any legal authority other than the statute itself, Defendant argues that "[t]he Act is . . . a consumer protection statute that it is focused on Utah and Utah consumers," and only "requires Utah companies to provide advance notice <u>to Utah consumers</u> if that company intends to disclose non-public personal information to third parties for compensation." (Mot. at 9 (emphasis added).). The argument is baseless. The statute evinces no such crippling restriction on the regulatory scheme. Rather, the statute sensibly expresses a general, unrestricted intent to regulate Utah-based companies' nonconsensual disclosures of nonpublic personal information obtained from any "person" (regardless of his or her state of residence) as a result of a sale of goods "initiated or completed in" Utah, to prevent all of the evils that may result from the unauthorized trafficking of consumers' nonpublic personal information by Utah-based companies. *See* Utah Code Ann. §13-37-102(4); *see also* Ex. A at 13:20-23 (Rep. Wayne Harper stating that "[t]he notice is an essential part of what needs to be done to help the residents of the state of Utah <u>and elsewhere</u> to understand the choices they make, to have informed choices.") (emphasis added); *see also id.* At 18:25-19:1 (Rep. Aagard, NISNPIA's sponsor, explaining that the statute regulates "companies domiciled in the state of Utah").

Defendant cites to the statute's definitions of "consumer transaction" and "commercial entity" in an effort to show that the statute is exclusively "focused . . . on consumers in Utah." (Mot. at 9-10 (citing Utah Code Ann. §13-37-102(4)(a)).) But the definitions of "commercial entity" and "consumer transaction" differ at exactly the point where Defendant has placed all its

chips. The definition of "commercial entity" is expressly limited to "persons" with an "office or other place of business located in [Utah]." Utah Code Ann. § 13-37-102(2)(a)(i) (emphasis added). The definition of "consumer transaction," by contrast, contains a long list of transactions that are included – among them, for example, "the use of nonpublic personal information in relation to a transaction with a person if the transaction is for primarily personal, family, or household purposes," *id.* § 13-37-102(4)(b)(i) (emphasis added) – but contains no requirement that the "person" making the transaction reside or otherwise be located in Utah. By requiring that a company maintain an office or place of business in Utah to qualify as a "commercial entity," without requiring that an individual reside in Utah to qualify as a "person" protected by the statute, the legislature clearly intended to broadly protect any consumer, wherever he or she resides, from having his or her nonpublic personal information disclosed for compensation by Utah-based companies, absent the person's informed consent (i.e., unless he or she receives the notice specified in section 13-37-201 before engaging in the underlying consumer transaction). *See Utah Physicians for a Healthy Env't v. Kennecott Utah Copper, LLC*, 191 F. Supp. 3d 1287, 1295 (D. Utah 2016) ("[W]hen the drafter of a statute 'includes particular language in one section of a statute but omits it in another[,] [the court] presumes that [the drafter] intended a difference in meaning.'") (quoting *Dalzell v. RP Steamboat Springs, LLC*, 781 F.3d 1201, 1209 (10th Cir. 2015)); *see also* Ex. A at 13:20-23 (Rep. Wayne Harper stating that "[t]he notice is an essential part of what needs to be done to help the residents of the state of Utah and elsewhere to understand the choices they make, to have informed choices.") (emphasis added).[20]

---

[20]   Indeed, when the Utah legislature intends to limit a statute's protections to persons in Utah, it does so explicitly. *See, e.g.,* Utah Code Ann. § 19-1-503 (restricting sales of engine coolants "to a person in this state").

The FAC states a claim for violation of NISNPIA, and the Motion should be denied.

### III.   The Class Proposed in the FAC is Defined Using Objective Criteria and Aligned with the Relevant Statutory Provisions, and no Portion of it Should be Stricken

Finally, Defendant moves to strike from the proposed class definition the phrases "all persons in the United States" (the residence criterion for membership) and "obtained by Mrs. Fields on or after January 1, 2004" (the criterion limiting membership to persons whose "Private Purchase Information" was obtained by Defendant on or after January 1, 2004). Both criteria are appropriate, and neither should be stricken.

First, because there is no merit to Defendant's position that non-residents of Utah cannot redress violations of the statute, *see supra* Part II, there is no basis to strike the nationwide scope of the proposed class definition. The factual allegations of the FAC plausibly show, and discovery has already begun to confirm, that Defendant processes and ships all of the orders placed by its customers from its headquarters in Salt Lake City, Utah. (*See* FAC ¶ 134.) Thus, whether Defendant's sales of consumer goods were "completed in [Utah]" within the meaning of the statute is a question capable of class-wide resolution in one stroke.[21]

Second, Defendant asks the Court to strike "the class allegations relating to data allegedly obtained by Mrs. Fields before October 11, 2021," one year before the filing of the case, on the grounds that the limitation period applicable to Plaintiffs' claims is one year and that the statute is violated, and a claim under it accrues, "no later than the date that a commercial entity obtains a customer's nonpublic personal information" without having provided the required notice. (Mot. at 12.) That is a remarkably sloppy misreading of the statute.

The statute prohibits commercial entities like Defendant from disclosing a customer's non-public personal information pertaining to a consumer transaction, obtained by the entity on or after January 1, 2004, without having provided the customer the notice specified in section 13-37-201

---

[21]    Should discovery reveal that not all customer orders were shipment orders, or that not all shipment orders were shipped by Mrs. Fields from Utah, Plaintiffs will narrow the definition of the proposed class that they ultimately move to certify accordingly. *See, e.g., Vaszlavik v. Storage Tech. Corp.*, 183 F.R.D. 264, 270 (D. Colo. 1998) (granting class certification after finding plaintiffs appropriately narrowed the definition of the class originally proposed in the complaint).

before he or she made the consumer transaction. *See* Utah Code Ann. § 13-37-202. And the statute provides a cause of action against any commercial entity that makes a prohibited disclosure in violation of section 13-37-202. *See* Utah Code Ann. § 13-37-203(1)(c). Thus, a claim can only possibly accrue under the statute upon a company's disclosure of a person's nonpublic personal information for compensation to a third party. *See* Ex. A at 10:2-6 (Rep. Aagard, NISNPIA's sponsor, explaining that the statute only subjects companies to liability for statutory damages to "consumers whose information was sold"). And if a company never discloses a customer's nonpublic personal information for compensation to a third party, no claim under the statute ever accrues, even if the company collected the customer's nonpublic personal information in connection with a consumer transaction without first providing him or her the notice specified in section 13-37-201.

In other words, Defendant is free to collect nonpublic personal information from its customers without providing notice, and Defendant is free to sell its customers' nonpublic personal information to third parties so long it provided them notice before they made their purchases, but Defendant is not free to sell its customers' nonpublic personal information to third parties if it did not provide them the section 13-37-201 notice before their purchases. The conduct at issue in this case concerns Defendant's disclosures of Plaintiffs' nonpublic personal information to third parties for compensation, without having ever provided Plaintiffs the notice specified in section 13-37-201 before they made their purchases. It was these undisclosed, nonconsensual disclosures of Plaintiffs' non-public purchase information (obtained by Defendant on or after January 1, 2004) – not its failure to provide Plaintiffs the notice specified in section 13-37-201 before Plaintiffs made their purchases – that gave rise to Plaintiffs' claims for relief under the statute. Thus, the proposed class definition's limitations on the timing of Defendant's disclosures of nonpublic information (to those that occurred during the applicable limitation period) and of Defendant's collection of that information in the first place (to on or after January 1, 2004) are both in complete alignment with the statutory scheme. There is no basis for striking any portion of it.

Notably, in the Motion, Defendant does not challenge the sufficiency of the FAC's allegations that Defendant disclosed Plaintiffs' nonpublic personal information to third parties for compensation "during the applicable limitation period," even assuming that the limitation period applicable to Plaintiffs' claims is one year as Defendant contends.  While Plaintiffs believe the limitation period applicable to a NISNPIA claim is actually three years, *see* Utah Code Ann. § 78B-305(4) & *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 502 (D. Utah 2017), the Court need not decide this issue to resolve the Motion.[22]

The class definition proposed in the FAC is properly defined, and the Motion to strike should be denied.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated: March 21, 2024                    Respectfully submitted,

                                         /s/ Arun G. Ravindran
                                         ARUN G. RAVINDRAN (*PRO HAC VICE*)
                                         FRANK S. HEDIN*
                                         **HEDIN LLP**
                                         1395 Brickell Avenue, Suite 1140
                                         Miami, Florida 33131
                                         Tel: 305.357.2107
                                         fhedin@hedinllp.com
                                         aravindran@hedinllp.com

                                         * Pro Hac Vice App. Forthcoming

                                         *Counsel for Plaintiff and Putative Class*

---

[22]     Plaintiffs note that the discovery exchanged by the parties to date has already revealed that Defendant disclosed several of the Plaintiffs' nonpublic personal information for compensation to third parties, during both the one-year period preceding the filing of the complaint and the three-year period preceding the filing of the complaint.