IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JIM CURRY; STUART ROGOFF; MONIQUE BROOKINS; VALERIE GRUENKE; EMMA MENDOZA; ALEXIS BELL; DAWN WILKINS; CARLOS ROMERO; KATHI CASSI; TAMARA JOHNSON; VERONICA CALLAHAN; AMANDA PARKS; MARSHONNTRI AUSTIN; LINDA MICHAUD; and LOIS COLEMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MRS. FIELDS GIFTS, INC.,<br><br>Defendant. | **MEMORANDUM DECISION & ORDER ON DEFENDANT'S MOTION TO DISMISS**<br><br>Case No. 2:22-cv-00651-JNP-DBP<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

Plaintiffs allege that Mrs. Fields Gifts, Inc. ("Mrs. Fields") disclosed their private information in violation of a Utah data-privacy statute. Before the court is the motion of Mrs. Fields to dismiss the amended complaint. ECF No. 49 ("Mot."). For the reasons set out below, that motion is **DENIED**.

BACKGROUND

"Mrs. Fields is a snack-food company that sells[,] advertises, offers, and sells its products and services to consumers in its catalogues and on its website[.]" ECF No. 45 ("Am. Compl."), ¶ 84. Plaintiffs are fifteen former Mrs. Fields consumers who allege that Mrs. Fields disclosed nonpublic information that it obtained as a result of transacting with them. This information includes their "full names, home addresses, and fact that the listed individuals

are Mrs. Fields customers . . . as well as myriad other categories of individualized data and demographic information such as gender and the dollar amount of the products purchased." *Id*. ¶ 5.

Plaintiffs allege that Mrs. Fields is a Utah corporation with its headquarters and principal place of business in Salt Lake City, Utah. *Id*. ¶ 83. They further allege that Mrs. Fields "received and collected the money that Plaintiffs and Class members paid for their purchases[] and fulfilled [] orders" in Utah. *Id*. ¶ 134. Each of the plaintiffs resided outside of Utah at the time of their respective transaction or transactions with Mrs. Fields.[1]

### *NISNPIA*

Plaintiffs allege that Mrs. Fields, by disclosing their private information, violated Utah's Notice of Intent to Sell Nonpublic Personal Information Act, UTAH CODE ANN. § 13-37-101 *et seq*. ("NISNPIA" or "Act"). NISNPIA commands that "[a] commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with" certain disclosure requirements specified by the Act. UTAH CODE ANN. § 13-37-202(1).

The NISNPIA's reach is limited by its definition of certain key terms in this prohibitory language. First, by "commercial entity," the NISNPIA refers to "a person that [] has an office or other place of business located in the state; and [] in the ordinary course of business transacts a consumer transaction in this state," excluding governmental entities and related entities. *Id*. § 13-37-102(2)(a). Second, "[c]onsumer transaction" is defined to mean

---

[1] Plaintiffs "seek to represent a class defined as all persons in the United States who, at any point during the applicable statutory period, had their [p]rivate [p]urchase [i]nformation, obtained by Mrs. Fields on or after January 1, 2004 as a result of a consumer transaction, disclosed to a third party by Mrs. Fields[.]" *Id*. ¶ 124.

  (i) a sale, lease, assignment, award by chance, or other written or oral transfer or disposition:
    (A) that is initiated or completed in this state; and
    (B) of:
      (I) goods;
      (II) services; or
      (III) other tangible or intangible property, except securities and insurance or services related thereto; or
  (ii) a transaction:
    (A) that is initiated or completed in this state; and
    (B) that constitutes credit offered or extended by a commercial entity to a person primarily for personal, family, or household purposes.

*Id*. § 13-307-102(4)(a).[2]

  NISNPIA provides that persons whose nonpublic personal information is disclosed by a commercial entity in violation of the terms laid out in section 13-37-102 may bring an action for "$500 [and court costs] for each time the commercial entity fails to provide the notice required by this section in relation to the nonpublic personal information of the person who brings the action[.]" *Id*. § 13-37-203(2).[3] Through their amended complaint, plaintiffs seek class certification under

---

[2] The term "[c]onsumer transaction" also includes

 (i) the use of nonpublic personal information in relation to a transaction with a person if the transaction is for primarily personal, family, or household purposes; and

 (ii) with respect to any transaction described in Subsection (4)(a):

  (A) an offer or solicitation;

  (B) an agreement;

  (C) the performance of an agreement; or

  (D) a charitable solicitation as defined in Section 13-11-3.

UTAH CODE ANN. § 13-307-102(4)(b). Nonpublic personal information is defined to include "the purchasing patterns of a person." *Id*. § 13-37-102(5)(b)(iii).

[3] Section 13-37-203(3) also states that "[a] person may not bring a class action under this chapter." However, in an order resolving a prior motion to dismiss filed by Mrs. Fields, this court determined that, "under the principles laid out by the Supreme Court in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)," this provision does not bind federal courts.

Rule 23 of the Federal Rules of Civil Procedure, a declaration that Mrs. Fields violated NISNPIA, damages as authorized by Utah law, and other fees and costs.

In the motion now before the court, Mrs. Fields argues (i) that plaintiffs lack standing to pursue their claims; (ii) that the NISNPIA's text excludes the transactions in question here because the plaintiffs were not located in Utah; and (iii) that certain categories in the putative class-action definition are overbroad and should be stricken from the amended complaint.

## LEGAL STANDARD

Federal courts "are courts of limited subject-matter jurisdiction." *Gad v. Kan. State Univ.*, 787 F.3d 1032, 1035 (10th Cir. 2015) (citing *Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1225 (10th Cir. 2004)). Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action from federal court for lack of subject-matter jurisdiction. The court "must [also], sua sponte, satisfy itself of its power to adjudicate in every case and at every stage of the proceedings." *State Farm Mut. Auto. Ins. Co. v. Narvaez*, 149 F.3d 1269, 1271 (quoting *Tafoya v. United States Department of Justice*, 748 F.2d 1389, 1390 (10th Cir. 1984)).

Dismissal of a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate where the plaintiff fails to state a claim upon which relief can be granted. When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

---

Rather, "Rule 23 [of the Federal Rules of Civil Procedure] entitles [p]laintiffs to maintain a class action in this court." *Curry v. Mrs. Fields Gifts, Inc.*, 2023 U.S. Dist. LEXIS 174922, at *3-*4 (D. Utah Sep. 28, 2023).

true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The complaint must allege more than labels or legal conclusion and its factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## DISCUSSION

### I. Standing

Mrs. Fields argues that the plaintiffs lack standing because they have not suffered a concrete injury-in-fact. Plaintiffs respond that they have standing by analogy to the traditional torts of disclosure of private information and intrusion upon seclusion.

### A. Standing After *Spokeo* and *TransUnion*

"Article III of the Constitution requires a plaintiff have standing to sue, meaning she has incurred (or will incur) (1) 'an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Shields v. Prof'l Bureau of Collections of Md., Inc.*, 55 F.4th 823, 827 (10th Cir. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). As *Spokeo* made clear, such injury must be both "concrete *and* particularized." *Spokeo*, 578 U.S. at 334 (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 180-181 (2000) (emphasis added)). "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id*. at 340. With regard to history,

> [b]ecause the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts.

*Id*. at 340-41.

In *TransUnion LLC v. Ramirez*, the Court suggested that reference to history in search of an alleged harm's "close relationship to a harm . . . traditionally [] regarded as providing a basis for a lawsuit" is more than simply instructive. 594 U.S. 413, 424-25 (2021). Indeed, such analogizing to history appears all but necessary to establish standing for intangible harms.

In pursuit of harms traditionally "regarded as providing a basis for a lawsuit," common-law torts emerge as the primary basis for historical analogy and as a critical point of analytical concern. *Id*. In *TransUnion*, the Court recites a few such traditional harms: "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id*. at 425 (citing *Meese v. Keene*, 481 U. S. 465, 473 (1987) (reputational harms), *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008) (disclosure of private information), and *Gadelhak v. AT&T Services, Inc.*, 950 F. 3d 458, 462 (7th Cir. 2020) (Barrett, J.) (intrusion upon seclusion)).

The *TransUnion* Court was also careful to emphasize that "[i]n looking to whether a plaintiff 's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts, [courts] do not require an exact duplicate." *Id*. at 433. Or, as the Tenth Circuit has clarified, the "harms must be similar 'in kind, not degree.'" *Shields*, 55 F.4th at 828 (quoting *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (internal quotation marks omitted)).

### B. Framing the Harm Alleged Here

With regard to this standing analysis, the parties first dispute the proper framing of the injury alleged—in other words, how the harm should be characterized so that it can be analogized to comparator torts. Mrs. Fields argues that "[t]he sum total of Plaintiffs' well-pleaded allegations of harm is that they allegedly failed to receive a statutorily required notice from Mrs. Fields before their non-public personal information was shared with a third party for compensation." Mot. at 5.

6

According to this characterization, the harm complained of was the failure to provide a disclosure, making the injury "informational" by nature. *Id*.

But reference to the amended complaint reveals that this is not the gravamen of plaintiffs' alleged harm. *See* Am. Compl. ¶ 11 ("After such purchases were made, and during the applicable statutory period, Mrs. Fields disclosed, without providing Plaintiff Curry the prior notice required by UTAH CODE ANN. § 13-37-201, Plaintiff[s'] . . . Private Purchase Information to data aggregators, data appenders, and/or data cooperatives."). Neither is it a fair restatement of the harm addressed by NISNPIA, as evidenced by its plain text, which frames the prohibited act as disclosure. Indeed, its operative provision states that "[a] commercial entity *may not disclose* nonpublic personal information . . ." *Id*. § 13-37-202(1) (emphasis added).

Because it centers on the disclosure of information, plaintiffs' alleged harm is best compared to privacy torts such as public disclosure of private information and intrusion upon seclusion, rather than the conceptually distinct doctrine of informational injury.[4] To parry the analogy to these privacy torts, Mrs. Fields argues that "courts across the country[] have held that the mere disclosure of personal information does not confer Article III standing[.]" Mot. at 6. While it is true that "mere disclosure" (that is, disclosure *per se*) does not bear a close relationship to the harm protected by the comparator privacy torts, plaintiffs allege far more than mere disclosure.

### C. Publicity

As *TransUnion* explains, "[v]arious intangible harms can [] be concrete," including "reputational harms, disclosure of private information, and intrusion upon seclusion."

---

[4] As explained below, the court focuses, for the purposes of this memorandum decision and order, on the comparator tort of public disclosure of private information, which it calls by the shorthand moniker "public disclosure."

594 U.S. at 425 (citations omitted). Unsurprisingly, courts around the country have determined that the disclosure of nonpublic personal information can provide the basis for Article III standing. The relevant question turns on the nature of disclosure that must be alleged.

Mrs. Fields relies in large part on the Tenth Circuit's decision in *Shields*. 55 F.4th 823. Mrs. Fields maintains that the Tenth Circuit "held that disclosing debt information to a third[-]party mailer was not an intrusion on [that plaintiff's] privacy[] because it was not a public disclosure of the information." Mot. at 7. But *Shields* is inapposite. As an initial matter, the *Shields* court considered publicity as requisite to the comparator tort of public disclosure, *not* intrusion upon seclusion and,[5] more importantly, the plaintiffs' allegations here are easily distinguishable from the facts alleged in *Shields*.

*Shields* was a suit brought under the Fair Debt Collection Practices Act ("FDCPA") in which a creditor was alleged to have shared a debtor's nonpublic information with a third-party mailer so that the mailer could send the debtor a form letter. The plaintiff asserted that the disclosure of her debt information to the mailer was akin to the comparator tort of public disclosure. *Shields* held that the debtor did not have standing to pursue her claim because the disclosure of nonpublic information to a single private party (the mailer) under the alleged circumstances (where the mailer acted as a logistical middleman) did not reflect the sort of harm protected by (and thus lacked a close relationship with) that tort.

*Shields* followed the Eleventh Circuit's decision in *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236, 1239 (11th Cir. 2022). *Shields* and *Hunstein*, in turn, have been cited

---

[5] The *Shields* court's sole reference to the tort of intrusion upon seclusion was its brief observation that the plaintiff did not allege that her "private solitude" had been intruded. 55 F.4th at 829.

8

by other circuits. For example, the Seventh Circuit, in *Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 732 (7th Cir. 2023), cited *Shields* for the proposition that disclosure of nonpublic information to a single entity is qualitatively different than public disclosure. Significantly, each of these opinions involved the disclosure of information to a single mail vendor whose role was limited to generating and sending a form letter to a debtor on behalf of a creditor. *Hunstein*, 48 F.4th at 1240, 1245; *Shields*, 55 F.4th at 827; *Nabozny*, 84 F.4th at 733.

Such quintessentially private disclosure is qualitatively different from the harm at issue in the tort of public disclosure, *Hunstein*, 48 F.4th at 1246, and thus does not track the "gravamen" of that comparator tort. *Nabozny*, 84 F.4th at 737-38. More simply stated, private disclosure "is not just a less extreme form of public disclosure." *Hunstein*, 48 F.4th at 1249. In deciding just how "public" a disclosure must be, *Hunstein*, *Shields*, and *Nabozny* were tasked with a simple line-drawing problem, and offered the obvious answer—disclosure of information to a single private party (one who carries no risk or prospect of further disclosure or circulation of the information) is not only not public enough, it is not public at all. *Shields* and related cases must be considered in this context, rather than as standing for the broader proposition that disclosure-based injuries cannot provide a basis for standing generally, as Mrs. Fields suggests.

The facts as alleged by the plaintiffs here are different. The plaintiffs allege that Mrs. Fields markets their information openly, selling it to any buyer who is willing to pay. *See* Am. Compl. ¶¶ 99, 120. The plaintiffs specifically allege that Mrs. Fields disclosed the plaintiffs' nonpublic personal information "to data aggregators and data appenders," *id.* ¶ 137, other "third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes," and "other companies in exchange for lists containing the private purchase information of those third-party companies'

customers." *Id*. ¶ 139. In short, plaintiffs have alleged that Mrs. Fields "widely communicate[d]" their protected information, including to other parties themselves likely to further widely communicate it. *Shields*, 55 F.4th at 829.

The harm alleged by the plaintiffs here is qualitatively different from the private disclosure discussed in *Shields* and related cases and reflects the sort of harm at issue in the tort of public disclosure. *See Lupia*, 8 F.4th at 1192.[6] While this again invites the question of just how public is public enough to bear a close relationship with harm protected by the comparator tort of public disclosure, the court is satisfied that, wherever that line is, the plaintiffs here have crossed it.[7] Thus, the plaintiffs have standing to pursue their claims.[8]

---

[6] Formulating the precise degree of publicity that would create liability under the common-law tort of public disclosure is not necessary. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019) ("Our inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable.").

[7] In *Seale v. Peacock*, 32 F.4th 1011 (10th Cir. 2022), the Tenth Circuit analogized to "invasions of privacy" somewhat broadly in determining that a plaintiff had standing in a case involving the unwanted disclosure (through anonymous letters) of his private information. *Id*. at 1020-21. It is unclear exactly what proposition is to be drawn from *Seale* because the panel in that case did not clarify what comparator tort it was analogizing to. In any case, *Seale* seems to support a generalized privacy interest against the unauthorized access to or disclosure of information. But, having determined that the harm alleged by plaintiffs here tracks the gravamen of the tort of public disclosure, the court need not rely on *Seale*.

[8] The parties do not dispute other elements of the comparator tort, such as offensiveness. While the Eleventh Circuit demands element-by-element analogy to traditional torts to establish standing, *see Hunstein*, 48 F.4th at 1248, the Tenth Circuit, apparently, does not. *See Lupia* 8 F.4th 1184 (not considering each and every element of the comparator tort of intrusion upon seclusion before determining that standing has been established). Neither do other circuits. *E.g.*, *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1192 n.3 (7th Cir. 2021) (expressly repudiating the element-by-element approach adopted in *Hunstein*).

Additionally, because the disclosure-based harm is sufficient—it not necessary to consider Mrs. Fields's argument regarding junk mail. Harm arising from disclosure (analogous to the traditional tort of public disclosure) and harm arising from junk mail (or reliance on such junk mail causing

## II. Completion of Transactions Under NISNPIA

Mrs. Fields next argues that the plaintiffs have failed to state a claim upon which relief can be granted because the conduct alleged in the complaint does not actually violate NISNPIA. In particular, Mrs. Fields argues that plaintiffs "fail to plead that any of the named Plaintiffs 'initiated or completed' a consumer transaction" in the State of Utah because all named plaintiffs placed and received their orders from Mrs. Fields outside of Utah. Mot. at 9 (quoting UTAH CODE ANN. §13-37-102(4)). Thus, by Mrs. Fields's argument, NISNPIA only protects consumers located within the State of Utah at the time of a transaction because a transaction is both initiated and completed where the consumer is located. *See* Mot. at 10 n.1.

Under the plaintiffs' reading, however, a sale is completed "at the time and place of shipment"—that is, where the merchant is located, rather than where the consumer is located. ECF No. 54 ("Opp'n Mem.") at 19 (citation omitted). To make their case, the plaintiffs rely primarily on analogy to the Uniform Commercial Code ("UCC"). Utah courts sometimes draw from the UCC to answer definitional questions arising in the context of transactions. *E.g.*, *Utah Local Gov't Tr. v. Wheeler Mach. Co.*, 2008 UT 84, ¶ 34, 199 P.3d 949. Plaintiffs argue that, because the UCC would dictate that transactions like this one are complete at the time and place of shipment, NISNPIA-covered consumer transactions are also.

But analogical recourse to the UCC is unnecessary here. More-traditional tools of statutory interpretation suffice and the plain text alone "decides this case." *Gallardo v. Marstiller*, 596 U.S. 420, 428 (2022). The text and structure of NISNPIA reveals that Mrs. Fields's proposed

---

plaintiffs to do something) are separate inquiries, considered by *Shields* as independent avenues of establishing concrete injury. *See* 55 F.4th at 828.

interpretation—namely, that the Act only regulates transactions with consumers who are themselves located in Utah—is infirm. This is so for two reasons.

***First***, beginning with the definitional provision in section 102(4)(a)(i)(A) itself,[9] Mrs. Fields's proposed reading runs counter to the well-established semantic presumption against surplusage.[10] This is so because its interpretation equates the place of initiation with the place of completion. If the statute regulated only transactions where the consumer was located in Utah, and if initiation and completion both occur where the consumer is located, the statutory language specifying that a consumer transaction is regulable when it is "initiated or completed" in Utah would be inexplicable. By disregarding any difference between initiation and completion, Mrs. Fields's interpretation renders the legislature's decision to list two alternative actions in the disjunctive (initiation *or* completion) redundant.[11]

***Second***, reference to the other provisions in NISNPIA's definitions section similarly counsels against Mrs. Fields's proposed interpretation. This is so because, as section 102(2)(a) makes clear, the Utah legislature knew perfectly well how to impose geographic limitations on

---

[9] As stated above, NISNPIA's reach is limited to the disclosure of information by those commercial entities that have "an office or other place of business" in Utah and that, "in the ordinary course of business[,] transact[] [] consumer transactions" in Utah. UTAH CODE ANN. § 13-37-102(2)(a). "Consumer transaction" means certain transactions "initiated or completed" in Utah, including sales, leases, assignments, offers, solicitations, and agreements. *Id*. §§ 13-37-102(4)(a)(i), 102(4)(b)(ii).

[10] "If possible, every word and every provision [of a statute] is to be given effect" because the court assumes that the legislature would not intend to "adopt a nullity." *Croft v. Morgan Cty.*, 2021 UT 46, ¶ 32, 496 P.3d 83 (citations omitted); *accord Surplusage Canon*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[11] Similarly, there are no reasonable circumstances under which a consumer would initiate a transaction out of state (by placing an order, for example), but complete that same transaction in the state (by receiving it).

NISNPIA's coverage, and did in fact do so in defining commercial entities—not just once, but twice. First, it demanded that regulable commercial entities have "an office or other place of business" in Utah. Second, it demanded that, commercial entities, "in the ordinary course of business[,] transact[] [] consumer transactions" in Utah.[12] However, no such geographic limitations are indicated in the statutory text as it relates to a consumer's location. If the legislature wanted to impose similar geographic limitations on NISNPIA's reach on the basis of a consumer's location, the court is satisfied that it would have done so. That the legislature would regulate a commercial entities' geographic location so clearly casts doubt on the proposition that it would regulate a consumer's location so cryptically.

Mrs. Fields's proposed interpretation suggests that both the commercial entity and consumer at issue must be located in Utah for NISNPIA to have effect. But the Utah legislature only imposed a textual limitation on commercial entities and was silent as to consumers.[13]

---

[12] Notably, section 102(2)(a)(ii) does not necessarily suggest that *this* consumer transaction be transacted in Utah, but rather just that the commercial entity ordinarily conduct *some* business in Utah. Here, the Utah legislature demonstrates an ability to fine-tune the geographic reach of NISNPIA. The court declines to tamper with these sensitive policy decisions.

[13] In a footnote in its reply memorandum, Mrs. Fields suggests that any reading contrary to its own would pose an extraterritoriality concern "by requiring, for example, a store in California or Maine to give a Utah statutory notice just because the company also has an office in Utah and ships goods from its Utah warehouse." Reply Mem. at 8 n.4. But if, as Mrs. Fields suggests in this hypothetical, a company is shipping goods from its Utah warehouse, then that transaction is, in a very straightforward sense, initiated or completed within Utah. In any case, the plaintiffs allege much more than that Mrs. Fields shipped goods from Utah. Indeed, they allege that

> [e]ach of Mrs. Fields's sales of tangible and/or intangible property to each of the Plaintiffs (and each of the Class members) was initiated and/or completed in Utah, where at all relevant times Mrs. Fields was headquartered and principally did business, maintained and operated its consumer-facing e-commerce website and prepared and disseminated to consumers its product catalogs, made offers to sell the tangible and/or intangible property at issue that Plaintiffs and Class members purchased, received and collected the money that Plaintiffs and Class members paid

Mrs. Fields's proposed interpretation lacks support in the statutory text, and the plaintiffs have stated a claim upon which relief can be granted under NISNPIA.

### III.   Motion to Strike Allegations

Finally, Mrs. Fields moves pursuant to Rule 12(f) to strike portions of plaintiff's putative class definition. In particular, Mrs. Fields moves on the bases of geography (for the reasons discussed above) and timeliness (on an argument regarding the timely accrual of claims under the Act and the applicable statute of limitations).

Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: [] on its own; or [] on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." FED. R. CIV. P. 12. On its face, Mrs. Fields's motion to strike portions of the putative class definition that it views as "overbroad" bears no clear relationship to Rule 12(f)'s language regarding the striking of "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Nothing about Mrs. Fields's argument suggests that the putative class definition is an insufficient defense, nor

---

for their purchases, and fulfilled the orders made by Plaintiffs and Class members by sending to them the tangible and/or intangible property that they had purchased.

Am. Compl. ¶ 134. Thus, the court need not decide that a transaction is initiated or completed from the location of shipping. Instead, it could very well stem from headquartering, maintaining the website, making offers to sell, collecting the money paid, and so on.

The case cited by Mrs. Fields, *Nevares v. M.L.S.*, 2015 UT 34, 345 P.3d 719, does not counsel otherwise. *Nevares* suggests that a presumption against extraterritoriality would be triggered given statutory silence regarding "sexual conduct between non-Utahns outside of Utah." *Id*. ¶ 37. Thus, where all parties engage in conduct outside of the state, the presumption against extraterritoriality demands a clear indication of extraterritorial application. But, as discussed above, no similar extraterritoriality concern is present here.

that it is redundant, immaterial, impertinent, or scandalous. Instead, Mrs. Fields seeks to cut to the chase of defining the class well before class certification.

Such use of Rule 12(f) to strike class allegations is generally "disfavored in practice." *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 59 (1st Cir. 2013) (quoting *Boreri v. Fiat S.p.A.*, 763 F.2d 17, 23 (1st Cir. 1985)). "This is so because 'striking a portion of a pleading is a drastic remedy and . . . it is often sought by the movant simply as a dilatory or harassing tactic.'" *Id*. (quoting 5C CHARLES ALAN WRIGHT, ET. AL., FEDERAL PRACTICE & PROCEDURE § 1380 (3d ed. 2011)). Further, the use of Rule 12(f) to shortcut class certification

> is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification.

*Id*. (quoting *Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012)) (citations omitted) (internal quotation marks omitted).

In some instances, as *Manning* recognizes, it may be "obvious from the pleadings that the proceeding cannot possibly move forward on a classwide basis[.]" *Id*. (citing *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011)). In such cases, it may be appropriate to resort to Rule 12(f) if certification would be "a clear impossibility." *Donelson v. Ameriprise Fin. Servs.*, 999 F.3d 1080, 1092 (8th Cir. 2021); *accord Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim.").

But the court is satisfied that the timeliness issue raised by Mrs. Fields is not obvious, nor would certification be clearly impossible. Thus, while determining the contours of the appropriate class (including on grounds related to the timely accrual of NISNPIA claims) may no doubt be

required in this action, this is not the appropriate juncture to do so.[14] At this point, Mrs. Fields invites the court to stretch Rule 12(f) beyond recognition—using a procedural mechanism for striking allegations to coax legal conclusions from the court and preview class certification. The court declines the invitation.

## CONCLUSION

For the foregoing reasons, Mrs. Fields's motion to dismiss, ECF No. 49, is **DENIED**.

DATED August 13, 2024.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

---

[14] The court emphasizes that it does not suggest any view of the parties' arguments on the timeliness issue. Instead, this is simply a matter for a future procedural juncture.